IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

BRADLEY J. ELKIN )
and LORRAINE L. ELKIN, )
 )
      Plaintiffs, ) TC-MD 150177N
 )
   v. )
 )
LINCOLN COUNTY ASSESSOR, )
 )
      Defendant. ) **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered July 31, 2015. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiffs appealed the real market value of property identified as Account R408329 (subject property) for the 2014-15 tax year. A trial was held on June 29, 2015, in the Oregon Tax Courtroom in Salem, Oregon. Plaintiffs both appeared for trial. Bradley J. Elkin (Elkin) testified on behalf of Plaintiffs. Craig Waldron (Waldron), appraiser, appeared and testified on behalf of Defendant. Plaintiffs attached over 50 pages to their Complaint, including a broker's letter regarding the sale of the subject property, the listing history for the subject property, and an inspection report for the subject property dated August 15, 2014. However, because Plaintiffs failed to submit those documents as exhibits in accordance with the court's exhibit exchange rule, Tax Court Rule-Magistrate Division (TCR-MD) 12, they were not considered by the court. Plaintiffs offered additional exhibits at trial on the cost to cure the subject property's physical deterioration. Defendant objected to those exhibits because they were not timely exchanged and the court excluded them. Defendant's Exhibits A through Q were received without objection.

/ / /

## I.  STATEMENT OF FACTS

In his appraisal report, Waldron described the subject property as a 2,884-square-foot house built in 1950 and situated on a 5,000-square-foot site.  (Def's Ex A.)  Elkin testified that the subject property is ocean front.  He testified that the subject property's prior owner remodeled the upper level of the subject property in 1995, but did not remodel the first floor, which is original to its 1950 construction.  Elkin testified that the subject property included a "nonconforming kitchen" on the second level.  (*See also* Def's Ex F at 1.)  He testified that the kitchen was added during the partial remodel of the subject property in 1995, but that it did not meet county codes and would have to be removed.

Waldron testified that Defendant added value for the subject property's second kitchen because it existed as of the January 1, 2014, assessment date; he did not make any adjustment for the fact that it was nonconforming.  Waldron testified that the subject property's upper level was class 4+ and its lower level was class 3.  His appraisal report described the subject property as class 4+.  (Def's Ex A.)

The parties agreed that the subject property suffered some from some curable physical deterioration as of the assessment date.  Elkin testified that the subject property's prior owner lived in Hawaii and did not maintain the subject property.  (*See also* Def's Ex F at 1 (listing stating "1 seller is a licensed agent in Hawaii").)  He testified that the subject property had some dry rot under the deck siding and on the side of the house.  Elkin testified that he obtained bids for repairs totaling $49,500, not including removal of the nonconforming kitchen.  He testified that the necessary repairs included:  adding insulation and sheetrock between the garage and first floor; adding a fireproof door; repairing the chimney cap, skylight, furnace, anchor railing, and stairs; replacing several windows; and completing some electrical work.  Elkin testified that

repairing the dry rot and siding was the largest item, with an estimated cost of $22,000.

Waldron testified that he determined the subject property was "76 percent good." He testified that he estimated the cost to cure the subject property was approximately $42,300 based on the difference between the subject property's real market value at "76 percent good" and at "100 percent good."

Elkin testified that Plaintiffs purchased the subject property after selling their former home, located directly across the street. He testified that the subject property had been on the market for 17 months. Plaintiffs purchased the subject property for $425,000 in September 2014. (Compl at 3; *See* Def's Ex C at 1.) Elkin testified that Plaintiffs were aware the subject property needed substantial repairs at the time they purchased it. He testified that Plaintiffs received a home inspection report detailing the subject property's physical deterioration.

Waldron testified that the sale of the subject property was a "good sale" and that Defendant had confirmed the sale. He testified that one sale does not make the market and that he found the subject property sale to be out of line with other market evidence. Waldron testified that he thought the subject property's sale price might have been low because of its physical deterioration and because Plaintiffs paid all cash. Elkin testified that Plaintiffs had to pay all cash because, given the subject property's physical deterioration and code violations, no bank would have financed the sale.

Waldron testified that he used a "market-related cost approach" to determine the subject property's 2014-15 real market value. He testified that a "market-related cost approach" relies on comparable sales adjusted using cost factors. Waldron testified that he tried to identify sales of oceanfront properties similar in age and class to the subject property. He testified that he only used arm's-length sales.

Waldron testified that he identified four comparable oceanfront properties that sold close to the January 1, 2014, assessment date. (*See* Def's Ex A.) The sales occurred between April and December 2014. (*Id.*) Waldron did not make any time adjustments. (*See id.*) The site sizes of the four comparable sales ranged from 3,200 to 4,500 square feet, while the subject property's subject property's site was 5,000 square feet. (*Id.*) Waldron made upward site adjustments ranging from $9,520 to $70,613. (*Id.*) He testified that the site adjustments were based on Defendant's 1993 and 1994 "land base" studies, which were trended to 2014. (*See* Def's Ex P, Q.[1]) He made upward "view" adjustments ranging from $7,000 to $28,245 to three of his sales. (Def's Ex A.)

Waldron's four sales were built between 1938 and 1979. (Def's Ex A.) They ranged in size from 999 to 1,508 square feet of gross living area, whereas the subject property had 2,884 square feet of gross living area. (*Id.*) Waldron testified that he made "gross living value" adjustments to his sales that reflected differences in size, class, and quality. (*See id.*) He testified that those adjustments were based on the Oregon Department of Revenue's 1993 Cost Factor Book. Waldron's "gross living value" adjustments were all upward and ranged from $82,140 to $107,550. (*Id.*) Each of his net adjustments was upward; they ranged from 23.2 percent to 48.2 percent of the unadjusted sale price. (*See id.*)

Waldron testified that he placed equal weight on all four of his comparable sales, and that he determined an indicated real market value for the subject property based on the average of the adjusted prices for the four sales. He testified that he concluded a real market value of $540,000 for the subject property. (*See* Def's Ex A.)

///

---

[1] Waldron testified that his comparable sales 1 and 2 were in the same neighborhood has the subject property and his comparable sales 3 and 4 were in a neighborhood north of the subject property. (*See* Def's Ex A.)

The subject property's 2014-15 tax roll real market value was originally $681,920 and its 2014-15 maximum assessed value was $503,350. (Compl at 2.) The board of property tax appeals reduced its real market value to $531,000. (*Id.*) Plaintiffs requested a 2014-15 real market value of $425,000. Defendant concluded that the subject property's 2014-15 real market value was $540,000, but noted that a real market value of $540,000 would not reduce Plaintiffs' property taxes for the 2014-15 tax year.

## II. ANALYSIS

The issue presented in this case is the 2014-15 real market value of the subject property.

A.    *Defendant's Motion to Dismiss at Trial*

At those close of Plaintiffs' trial presentation, Defendant moved to dismiss Plaintiffs' appeal, asserting that Plaintiffs' evidence was insufficient to prevail. The court denied Defendant's motion to dismiss. Tax Court Rule (TCR) 60 allows a party to "move for a dismissal at the close of the evidence offered by an opponent or at the close of all the evidence." [2] In order to prevail under TCR 60,

> "the moving party must demonstrate that the record contains no evidence to support the nonmoving party's claim or claims. The court will not weigh the evidence; rather, it will consider the entire record and afford the nonmoving party all reasonable inferences drawn therefrom, in the light most favorable to that party."

*Freitag v. Dept. of Rev.*, 18 OTR 368, 373-74 (2005).

As discussed in more detail below, "[a] recent sale of the property in question is important in determining its market value." *Kem v. Dept. of Rev.* (*Kem*), 267 Or 111, 114, 514 P2d 1335, 1337 (1973). Plaintiffs presented undisputed testimony that they purchased the

---

[2] TCR 60 is made applicable through the Preface to the Magistrate Division rules, which states that "[i]f circumstances arise that are not covered by a Magistrate Division rule, the rules of the Regular Division of the Tax Court may be used as a guide to the extent relevant."

subject property for $425,000 in an arm's-length transaction in September 2014. That evidence supports Plaintiffs' claim that the subject property's 2014-15 real market value was $425,000. Based on Plaintiffs' purchase of the subject property in September 2014, the court concluded that Defendant's motion to dismiss should be denied.

B.      *The 2014-15 Real Market Value of the Subject Property*

"Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas Co*., TC-MD No 020869D at 4 (Mar 26, 2003). Real market value is defined in ORS 308.205(1),[3] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction, occurring as of the assessment date for the tax year."

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; 308.210.

The real market value of property must be determined in accordance with methods and procedures adopted by the Department of Revenue. *See* ORS 308.205(2). The value of property must be considered using the three approaches to value: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. *See* Oregon Administrative Rules 150-308.205(A)(2)(a). Although all three approaches may not be applicable in a given case, all three approaches must be considered. *See id*.

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. *See* ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Plaintiffs "must provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). "Competent evidence includes appraisal reports and

_____

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D at 7 (Mar 13, 2012). If Plaintiffs' "evidence is inconclusive or unpersuasive, [Plaintiffs] will have failed to meet [their] burden of proof." *See Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). This court "has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

C.      *Subject Property Purchase Price as Evidence of Real Market Value*

Plaintiffs did not provide an appraisal report, but instead relied on their purchase price to establish the subject property's real market value. The lack of an appraisal report is not fatal because "[t]he various approaches to valuation * * * are only the vehicles used to determine the ultimate fact—market value." *Kem*, 267 Or at 114. "If the sale [of the subject property] is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Id*. "In the absence of data indicating that 'the price paid was out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' " *Ernst Brothers Corp. v. Dept. of Rev.* (*Ernst*), 320 Or 294, 300, 882 P2d 591 (1994) (quoting *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974)) (alteration in original). "Whether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974).

There is no dispute in this case that Plaintiffs' purchase of the subject property was a voluntary, arm's-length transaction. Waldron testified that he considered it to be a good sale, although he concluded the price was low based on other market evidence. The sale occurred approximately nine months after the January 1, 2014, assessment date and no evidence was presented to indicate that market conditions changed between January 1, 2014, and September 2014. Moreover, Waldron used sales from September and December 2014 in his sales comparison approach and did not make any time adjustments. The court concludes that the sale of the subject property was "recent" as of the assessment date.

Even though the court concludes that the sale of the subject property provides persuasive evidence of real market value in this case, the court will consider whether Defendant's evidence indicates that "the price paid was out of line with other market data material[.]" *See Ernst*, 320 Or at 300 (internal quotation marks omitted).

Waldron presented evidence under the sales comparison approach of four sales of oceanfront properties. Each of the sales was considerably smaller than the subject property, so Waldron's "gross living value" adjustments – which included size adjustments – were large, ranging from $82,140 to $107,550. He also made large site size adjustments, ranging from $9,520 to $70,613. Waldron's net adjustments ranged from 23.2 percent to 48.2 percent of the unadjusted sales prices. Large adjustments indicate that sales used by Walrdon may not be sufficiently comparable to the subject property. Additionally, the court questions the reliability of adjustments based on a 1993 cost factor book and land studies dated 1993 and 1994, given the January 1, 2014, assessment date. Market data obtained closer to the January 1, 2014, assessment date would have provided a more reliable basis for adjustments. Ultimately, the

/ / /

court finds Defendant's sales comparison approach unpersuasive for the reasons discussed above.

At trial, Waldron acknowledged that the subject property's sale price may have seemed low due to the fact that the subject property suffered from physical deterioration requiring an estimated $42,000 to $49,000 to cure. He also opined that the sale price might have been low because Plaintiffs paid cash. Elkin testified in response that Plaintiffs had to pay cash because they could not obtain financing for the subject property. Upon consideration of the evidence presented, the court is persuaded that Plaintiffs' purchase price of $425,000 provides the best evidence of the subject property's real market value as of January 1, 2014.

III. CONCLUSION

After careful consideration, the court finds that the subject property's real market value was $425,000 as of January 1, 2014, as indicated by the price that Plaintiffs paid to purchase the subject property in September 2014. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted. Defendant shall change the 2014-15 tax roll real market value of the property identified as Account R408329 to $425,000.

Dated this ___ day of August 2015.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR. Your complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on August 18, 2015.*