IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

RICHARD J. MURRAY,                        )
                                          )
            Plaintiff,                    )      TC-MD 150207N
                                          )
      v.                                  )
                                          )
WASCO COUNTY ASSESSOR,                    )
                                          )
            Defendant.                    )      **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered

October 20, 2015. The court did not receive a statement of costs and disbursements within 14

days after its Decision was entered. *See* TCR-MD 16 C(1).

## I. INTRODUCTION

Plaintiff appeals the real market value of property identified as Account 2039 (subject

property) for the 2014–15 tax year. A trial was held via videoconference on July 13, 2015.

Plaintiff and Georgiana A. M. Murray (Murray), Oregon-licensed real estate broker, appeared on

behalf of Plaintiff. Murray testified on behalf of Plaintiff. Darlene K. Lufkin (Lufkin), Chief

Appraiser, appeared and testified on behalf of Defendant.

Plaintiff's Exhibits 1 through 4 were received without objection. Plaintiff offered an

additional exhibit that was not exchanged prior to trial. Plaintiff stated that the exhibit was in

rebuttal of Defendant's appraisal report. Defendant objected to the admission of Plaintiff's

rebuttal exhibit because it was not exchanged prior to trial. Tax Court Rule-Magistrate Division

(TCR-MD) 12 C(1)(c) states: "A party submitting rebuttal evidence in a telephone trial must file

all rebuttal exhibits no later than 5 p.m. prior to the trial date." Trial was held via

videoconference, which is similar to a telephone trial in that the parties are not physically present

in the courtroom. As a result, the court excluded Plaintiff's rebuttal exhibit under TCR-MD 12 C(1)(c) because Plaintiff's rebuttal exhibits were required to be submitted no later than 5:00 p.m. on Friday, July 10, 2015.

Defendant's Exhibit A was admitted over Plaintiff's objection to the size of the text in that exhibit. Plaintiff raised his objection to the text size for the first time at trial and did not previously notify Defendant of his objection. Plaintiff confirmed that he had obtained assistance from Murray to review Defendant's Exhibit A prior to trial.

At the conclusion of his case-in-chief, Plaintiff orally moved for "summary judgment" under Oregon Rule of Civil Procedure (ORCP) 60 (regarding motions for a directed verdict). The court construed Plaintiff's motion as one under Tax Court Rule (TCR) 60 (regarding motions for dismissal at trial) and denied Plaintiff's motion. This court has previously explained the distinction between ORCP 60 and TCR 60, as well as the applicable standard under TCR 60:

> "[T]he ORCP 60 [is] a rule designed to govern when a court may remove an issue or matter from consideration by a jury—*i.e.,* a directed verdict. This court does not have a jury and, therefore, TCR 60 has a slightly different purpose: TCR 60 serves to allow the moving party to request the court to rule from the bench on the record at that time before the court. When the court evaluates a motion made pursuant to TCR 60, however, it will do so in a manner consistent with that taken by the state's other courts that are subject to ORCP 60. In order to prevail on a motion for directed verdict pursuant to TCR 60, the moving party must demonstrate that the record contains no evidence to support the nonmoving party's claim or claims. The court will not weigh the evidence; rather, it will consider the entire record and afford the nonmoving party all reasonable inferences drawn therefrom, in the light most favorable to that party."

*Freitag v. Dept. of Rev.*, 18 OTR 368, 373–74 (2005) (citation omitted).

TCR 60 thus allows the court to dismiss a nonmoving party's claim if the record is wholly devoid of evidence in support of that claim. The only claim in this case is Plaintiff's appeal of the real market value of the subject property. Plaintiff carries the burden of proving that claim, not Defendant. *See* ORS 305.427. Therefore, Plaintiff's appeal is the only claim that

could be dismissed by the court. The court understood Plaintiff's motion as a request for judgment in Plaintiff's favor—made before Defendant had a chance to present its evidence—and not a request to dismiss Plaintiff's appeal. TCR 60 does not provide for such a request, and the court is not aware of any authority that would support Plaintiff's request. Accordingly, the court denied Plaintiff's motion.

## II. STATEMENT OF FACTS

A.      *Subject Property*

The subject property is a two-bedroom, one-bathroom residence built in 1941, located on a 0.23 acre lot in The Dalles, Oregon. (*See* Ptf's Ex 1 at 1–2, 10; Def's Ex A at 7, 19.) Plaintiff described the residence as a 972-square-foot building, "of which 132 [square feet] is an unheated breezeway." (Ptf's Ex 1 at 1–2.) Defendant described the residence as having a total living area of 840 square feet. (Def's Ex A at 2.) The subject property has a garage and a partial, unfinished basement. (Ptf's Ex 1at 2.) Murray testified that the subject property's bathroom can only be accessed by passing through a bedroom. (*See also* Ptf's Ex 2 at 29.) The subject property has a paved driveway, part of which is subject to an easement for ingress and egress that benefits the two lots to the north of the subject property. (Ptf's Ex 1 at 2; Def's Ex A at 5.)

The subject property's tax roll real market value for the 2014–15 tax year was $154,430. (Compl at 2.) Its maximum assessed value was $124,141. (*Id.*) Plaintiff appealed to the Wasco County Board of Property Tax Appeals (BOPTA), and BOPTA sustained the values on the tax roll. (*Id.*) Plaintiff timely appealed, requesting that this court find a real market value of $92,790. (*Id.*at 1) Defendant recommended that the court sustain the real market value on the tax roll. (Def's Ex A at 1.)

/ / /

B.    *Plaintiff's Evidence*

Murray testified for Plaintiff and presented Plaintiff's exhibits. Murray testified that she has been "in real estate since 1986" and that she has been a principal broker in Oregon since 1989. She testified that she has been preparing broker price opinions of real property since 2000. (*Cf.* Ptf's Ex 1 at 2.) Plaintiff bought the subject property in 2002, and Murray testified that she had subsequently used the subject property as her office. (*See id.* at 1.) Murray testified that, after Plaintiff's purchase, she and Plaintiff updated the subject property with new windows and doors. Murray explained that she and Plaintiff "had to apply for a neighborhood center overlay" so that the property's use as an office would comply with local zoning regulations.

Plaintiff provided a broker's price opinion, prepared by Murray, that compared the subject property with other similar properties. (Ptf's Ex 1.) Murray testified that her usual practice when preparing broker's price opinions was to only use properties within 80 to 120 percent of the subject property's square footage. Murray used four "listing comparables" and six "sold comparables," and compared the tax roll improvement value for each property to the tax roll improvement value for the subject property. (Ptf's Ex 1 at 5–8). None of the comparables were adjusted for differences with the subject property. (*See id.*) Based on those comparisons, Murray concluded that "[t]he value of the improvements on the subject property [is] too high and should be reduced to * * * [$]66,000." (*Id.* at 9.) In addition, Murray provided seven "land value comparisons," comparing the tax roll land value for each of seven comparable properties with the tax roll land value of the subject property. (*Id.* at 8.) Murray wrote that, because of the easement and incorrect boundary lines, the useable portion of the subject property was actually 0.14 acre. (*Id.* at 2.) Murray concluded that the subject property's land real market value should

equal that of other 0.14-acre lots because of "the actual dimensions of the property[.]"[1] (*Id.* at 9.)

Murray testified that she concluded the subject property's real market value was $92,790 by adding $66,000, the amount she concluded for the subject property's improvements, to $26,790, the tax roll land value for 0.14-acre properties that she found to be similar to the subject property. (*See* Ptf's Ex 1 at 8–9.)

Plaintiff provided a sale agreement between Plaintiff and a prospective buyer of the subject property, dated March 26, 2015. (Ptf's Ex 4 at 3.) The sale price of the property was $110,000, but Plaintiff agreed to pay $4,000 of the buyer's closing costs. (*Id.* at 2.) Murray testified that she put the subject property on the market with an asking price of $115,000 in October of 2014. Murray testified that the closing date had been extended five times at the request of the buyer's lender, but the sale could close "today or tomorrow."

The buyer and her lender commissioned an independent property inspection and independent appraisal of the subject property. (*See* Ptf's Ex 2 (appraisal report); Ptf's Ex 3 (property inspection report).) Murray testified that after the inspection, which occurred on April 1, 2015, Plaintiff agreed to make some minor repairs to the subject property. (*See* Ptf's Ex 3 at 1.) Murray testified that the appraisal report was prepared for the buyer's lender. The appraisal report concluded that the subject property's real market value was $110,000 as of April 18, 2015. (Ptf's Ex 2 at 1.) Murray testified that she agreed with the appraiser's conclusion. The appraiser who prepared the report was not available to testify.

/ / /

---

[1] Murray also analyzed eight properties that she believed were used by Defendant to determine the real market value of the property. She testified that when she inquired with Defendant's office about properties used to determine the value of the subject property, she was given a handwritten list containing those properties. (*See* Ptf's Ex 1 at 14.) Lufkin testified that Defendant does not use the sales comparison approach when setting the tax roll. Three of the properties were used as comparables by Defendant in this appeal but most were not. (*Compare* Ptf's Ex 1 at 14 *with* Def's Ex A at 7-8.)

Lufkin gave rebuttal testimony regarding her specific concerns with the report and her general concern that the appraiser was unavailable to answer those questions. Lufkin testified that the appraisal report indicated the market values in the subject area were increasing and there was a supply shortage. (*See* Ptf's Ex 2 at 6.) She testified that the report indicated prices and inventories of comparable properties, however, were "[s]table." (*Id.* at 13.) The appraisal report stated an area for the residence—1,128 square feet—that differed from the area used by both Plaintiff and Defendant. (*Id.* at 6.) Lufkin testified that the appraiser disregarded updates to the subject property. Lufkin testified that the appraiser made large, unexplained adjustments to comparable properties. Lufkin testified that the appraisal appeared to be incomplete and that some pages were cut off.

C.    *Defendant's Evidence*

Lufkin presented an appraisal report that she prepared for the subject property. (Def's Ex A.) Lufkin determined a real market value of $154,430 for the subject property using a "market related cost approach."[2] (Def's Ex A at 4.) Using the "market comparison approach," Lufkin identified eight comparable sales of residential properties indicating a value range from $145,030 to $156,873. (*Id.* at 6–8.) Lufkin put the most weight on sales 2 and 3 and concluded a $151,178 real market value for the subject property under the market comparison approach. (*Id.* at 6.) Lufkin adjusted the comparable properties for differences with the subject property, including effective year built, quality, size, and "yard/other imp[rovement]s." (*Id.* at 7–8.) Lufkin also made adjustments for differences in land real market value ranging from $38,800 downward to $4,880 upward. (*Id.*) Each comparable's land real market value adjustment was

---

[2] After an inspection of the subject property by Defendant, Lufkin revised certain factors under her cost approach, which yielded an indicated value of $159,080. (Def's Ex A at 4.) Because the revised real market value would "not affect the Taxable Value," Lufkin recommended that the tax roll value remain unchanged. (*Id.*)

equal to the difference in land real market value between that comparable and the subject property. (*See id.*) Regarding the subject market, Lufkin wrote: "The activity in 2014 has picked up in sale inventory with a small increase in value * * *. The further from the assessment date the sale occurred the less reliable it becomes although the value change indicated is relatively minor in time * * *." (*Id.*) Lufkin's final value conclusion was a real market value of "$154,430 based on the Cost Approach which is supported by [the] Market Approach * * *." (*Id.* at 3.)

## III.  ANALYSIS

The issue before the court is the real market value of the subject property for the 2014-15 tax year. ORS 308.205(1) defines real market value:[3]

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; 308.210.

There are three approaches to value that must be considered to determine the real market value of real property: the sales comparison approach, the cost approach, and the income approach. *See* OAR 150-308.205-(A)(2)(a).[4] In a particular case, all three approaches may not be applicable; however, each approach "must be investigated for its merit." *Id.* Whether any one approach is more persuasive in a given case "is a question of fact to be determined by the court" based on the record before it. *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

/ / /

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

[4] The reference is to the Oregon Administrate Rules (OAR).

A.    *Highest and Best Use*

The Department of Revenue's administrative rules define "highest and best use" as "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value." OAR 150-308.205-(A)(1)(e). "To find a property's highest and best use, an appraiser identifies the property's potential alternative uses and tests them against the criteria set out in the department's definition of highest and best use." *Hewlett-Packard Co. v. Benton County Assessor*, 357 Or 598, 602, 356 P3d 70 (2015). "The *first* issue is the highest and best use of the property; the *second* issue is the market value of the property at that use." *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809 (1990) (emphasis in original).

Neither party completed a highest-and-best-use analysis. Under her "market related cost approach," Lufkin wrote: "The property legal use is still commercial and after consideration the valuation based on highest and best use as commercial is still appropriate." (Def's Ex A at 4.) It is unclear how Lufkin reached that highest-and-best-use conclusion, or how she used that conclusion to develop her opinion of value. Lufkin's analysis under the market comparison approach considered eight residential properties as comparable to the subject property. (*See id.* at 7-8.) Only one of her comparable sales had the same commercial overlay as the subject property. (*See id.* at 7.) Lufkin did not make any adjustments to the remaining seven residential sales that lacked the commercial overlay. No additional value was assigned to the commercial overlay. In effect, both Lufkin and Murray valued the subject property as a residential property. Given the parties' practical agreement that residential properties are most comparable to the subject property, the court will treat its highest and best use as residential.

/ / /

B.      *Plaintiff's Evidence of Real Market Value*

Plaintiff has the burden of proving his case by a preponderance of the evidence.  *See* ORS 305.427.  "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence."  *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).  To carry his burden, Plaintiff must do more than "criticize [the] county's position."  *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002).  Plaintiff must "provide competent evidence of the [real market value] of [his] property."  *Id.*  Competent evidence of real market value "includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers."  *Danielson v. Multnomah County Assessor*, TC-MD 110300D, WL 879285 (Mar 13, 2012).

1.      *Broker's price opinion*

The broker's price opinion prepared by Murray relied on sales and other data from comparable properties to reach an improvement real market value conclusion of $66,000.  Under the sales comparison approach, "[t]he court looks for arm's length sale transactions of property similar in size, quality, age and location to [the subject property] in order to determine the real market value."  *Richardson v. Clackamas Co.*, TC-MD 020869D, WL 21263620 at *3 (Mar 26, 2003).  "[O]nly actual market transactions of property comparable to the subject, or adjusted to be comparable," may be used in the sales comparison approach.  OAR 150-308.205-(A)(2)(c).  Appropriate adjustments are especially important "[b]ecause sales are seldom comparable in every detail[.]"  *Ward v. Dept of Revenue*, 293 Or 506, 511, 650 P2d 923 (1982).

Murray's broker's price opinion does not meet the requirements of the sales comparison approach.  The comparable properties were not adjusted for age, size, location, or any other differences with the subject property.  The lack of adjustments seriously diminishes the

persuasive value of those comparables. Murray also relied heavily on property tax assessment values as the point of comparison between the subject property and the comparable properties, and she relied exclusively on tax roll values to determine the land real market value for the subject property. Tax roll values are not "transactions" and thus not relevant to the sales comparison approach. *See Oldenburg v. Wasco County Assessor*, TC-MD 150145N, WL 4724813 at *5 (Aug 10, 2015). Moreover, Murray concluded that Defendant's real market value "is too high," but did not clearly identify how she reached a value conclusion of $66,000 for the subject property's improvements. (*See* Ptf's Ex 1 at 5–9.) As stated above, Plaintiff must offer his own evidence of real market value and cannot meet his burden by merely criticizing Defendant's conclusion of real market value. *See Woods*, 16 OTR at 59. The court finds that the broker's price opinion offers only incomplete evidence of the subject property's real market value.

2. *Appraisal report and inspection report*

Plaintiff also provided an appraisal report prepared for the buyer's lender in the pending sale of the subject property. As detailed above, Lufkin raised legitimate concerns with the appraisal report itself and the fact that the appraiser was not available to testify. Had the appraiser been available to testify, perhaps those concerns would have been addressed. Because the appraiser did not testify, the court gives limited weight to Plaintiff's appraisal report. Plaintiff also provided a property inspection report for the subject property. The inspector who prepared the report did not testify. The report identified areas in need of repair or of concern, but it did not reach any conclusions as to the cost of repairs or of the subject property's real market value.

/ / /

3.      *Pending sale price*

Plaintiff provided a sale agreement which shows that a buyer offered, and Plaintiff accepted, $110,000 for the subject property.

> "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value. * * *."

*Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973). "In the absence of data indicating that 'the price paid was out of line with other market data material * * * [a recent sale is] one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' " *Ernst Brothers Corp. v. Dept. of Rev.*, 320 Or 294, 300, 882 P2d 591 (1994) (quoting *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974)).

The sale in question here had not closed at the time of trial, although Murray testified that it "could close today or tomorrow." Nonetheless, the pending sale of the subject property is relevant to the court's inquiry, as this court's case law demonstrates. In *Hines v. Department of Revenue*, 12 OTR 78, 79 (1991), taxpayers had accepted three conditional offers on the subject property, but each offer had been withdrawn and the property remained on the market at the time of trial. The court observed that "[a]lthough [the offers were] not completed sales, they come close to the 'highly persuasive effect' given to arm's-length sales of a subject property" under *Kem. Id.* at 80. The court concluded that the conditional offers, rather than the defendant's comparable sales, provided the most persuasive evidence of real market value. *See id.* In this case, the court will also consider whether the pending sale of the subject property is persuasive evidence of real market value.

/ / /

Plaintiff provided the court with substantial evidence regarding the pending sale. Murray, who has been a principal broker in Oregon since 1989, originally advertised the property for sale by owner for $115,000. Murray was extremely familiar with the subject property; it was her office. Plaintiff's potential buyer made an offer after the subject property had been on the market for about five months. Plaintiff accepted the buyer's offer, which was slightly lower than the advertised price, and Plaintiff agreed to cover a portion of the closing costs. The buyer and her lender arranged for an independent appraisal and inspection of the subject property, and Plaintiff agreed to make minor repairs to the subject property at the buyer's request. In sum, the evidence depicts a knowledgeable seller and a knowledgeable buyer agreeing on a price for the subject property. The court therefore finds that the fact the sale of the subject property had not closed by the time of trial does not substantially impair the persuasive value of the sale price.

Before finding that a sale of the subject property is "very persuasive" of real market value under *Kem*, the court must determine that the sale of the subject property was both "recent" and "arm's length." *See Kem*, 267 Or at 114. The history of dealings between Plaintiff and the buyer, described above, supports the conclusion that the pending sale was arm's-length. Moreover, there is no evidence before the court that Plaintiff and the buyer were previously acquainted. Given the history of negotiation between the parties and the absence of a pre-existing relationship, the court finds that the pending sale of the subject property was arm's-length.

The court must next examine whether the pending sale of the subject property is "recent." "Whether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.* 270 Or 422, 426–27, 528 P2d 69

(1974). In some cases, the sale date may be so far removed from the assessment date "that it can be said as a matter of law" that conditions have changed. *Id*. at 427. Such a sale would not be considered recent. Where the sale is not too remote as matter of law, however, the court must look to "the underlying conditions affecting value" to determine if the sale falls "within a reasonable time of the assessment" date. *See id.* at 426-27.

In *Sabin*, the court considered whether the Tax Court correctly determined that two transactions involving the subject property—one from 1969 and one from 1972—were too remote from the January 1, 1971, assessment date. *See Sabin*, 270 Or at 427–29. The court concluded that the 1969 transaction was too remote because "prices in the area of the subject property rose dramatically between 1969 and the assessment date." *Id* at 427. However, even though the 1972 transaction occurred "almost two years after the assessment date," the court remanded the case to the Tax Court "for reconsideration of the assessment in light of the excluded 1972 sale" because there was "no indication in the record that the conditions affecting market value in 1972 were substantially different from those in 1971." *Id.* at 426–28. *Sabin* thus demonstrates that the court's inquiry into whether a sale is "recent" does not turn solely, or even primarily, on calendar dates. A party challenging a property's sale price as an indicator of value must put on evidence of a "shift in underlying conditions" to show that the sale price is a "distorted indication of the value on [the assessment date]." *Id*. at 428–29.

In this case, there is conflicting evidence of market conditions affecting the value of the subject property between the assessment date and the date the sale agreement was executed. Lufkin wrote that there was a "small increase in value" for homes in the subject area during 2014. (Def's Ex A at 6.) However, Lufkin did not adjust any of her comparable sales for time of sale, the latest of which occurred on December 20, 2014, nearly one year after the assessment

date. (*See id.* at 7–8.) Lufkin's analysis suggests that any increase in property values over that time were so small as to be insignificant. In Plaintiff's appraisal report, the appraiser indicated that property values were increasing in one section of the report, but he also indicated that sale prices and other data for comparable sales were stable in another section. (*See* Ptf's Ex 2 at 6, 13.) The court finds the market evidence here to be inconclusive. If anything, the evidence suggests that the subject property had a small increase in value, or no increase in value, between the assessment date and the sale negotiations. The court is satisfied that the potential of a small upward trend in sale prices is not enough for the court to disregard the pending sale price as too remote to be a persuasive indicator of real market value.

Before finding that the pending sale of the subject property is persuasive evidence of market value, the court will also consider whether the sale price is "out of line with other market data material[.]" *Equity Land*, 268 Or at 415. The court turns to Defendant's evidence of real market value.

C.     *Defendant's Evidence of Real Market Value*

Lufkin primarily relied on her "market related cost approach" to reach a value conclusion of $154,430, which was supported by the "market comparison approach."[5] Which approach is more persuasive of real market value is a question of fact to be determined by the court. *Pacific Power & Light*, 286 Or at 533.

"The cost approach is generally used for buildings under construction or for structures so recently built that no income history is yet available and where no comparable sales can be found." *Valley River Ctr. et al v. Dept. of Rev.*, 6 OTR 368, 377 (1976). The sales comparison approach is the preferred method of valuation where there is "a significant ascertainable market"

_____

[5] Neither party developed the income approach or indicated that subject property was viewed as an income-producing property.

for similar properties. *Ward*, 293 Or at 511. Here, the improvement on the subject property was constructed in 1941 and both parties identified a number of distinct comparable sales. The subject property is thus not typical of properties where the cost approach would provide the most persuasive evidence of value. Accordingly, the court finds that the sales comparison approach is the more persuasive approach to value. The court will look to Defendant's sales comparison analysis to determine whether the pending sale price is "out of line" with the market.

Lufkin identified eight comparable sales, put the most weight on sales 2 and 3, and reached an indicated value of $151,178. (Def's Ex A at 6.) Lufkin adjusted her comparable sales for differences with the subject property, including effective year built, quality, size, and other features of the improvements. (*See id*. at 7–8.) She did not explain how she determined the amounts of those adjustments. Lufkin made large, unexplained adjustments for the yard and "other improvements." (*Id*.) Lufkin also made adjustments for differences in land real market values, but she apparently did so by adjusting for the difference in the tax roll land real market values between the subject property and comparable properties. (*See id*.) That approach led to some curious results. For example, sale 2 and sale 3 had identical lot sizes and zoning, and were deemed equal in terms of location, access, and general appearance. (*Id*. at 7.) Yet sale 2 received a negative adjustment of $6,850 and sale 3 received a negative adjustment of $10,510. (*Id*.) Lufkin did not explain why such disparate adjustments were justified. The court finds that Defendant's market evidence is incomplete, and, therefore, the court is not persuaded that the pending sale price is out of line with the market.

D.      *Court's Conclusion of Real Market Value*

"[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties."

ORS 305.412. Plaintiff requested a real market value of $92,790, but Plaintiff's evidence did not support that value. However, Plaintiff did provide the court with persuasive evidence of the subject property's real market value in the form of a pending sale price. Defendant's evidence was insufficient to dissuade the court from finding that the pending sale price was persuasive evidence of real market value. As this court has explained,

> "reason dictates that sale of the subject property is better evidence than an estimate based upon sales of other properties. Other properties may be similar, but they are not exactly like the subject. The actual sale of the subject eliminates all speculation, estimation, comparisons and distinctions. In short, it answers all hypothetical questions with actual fact."

*Rhodes v. Dept. of Rev.*, 12 OTR 24, 26 (1991). The court concludes that the best evidence of value of the subject property as of the assessment date is the pending sale price of $110,000.

## IV. CONCLUSION

After careful consideration, the court concludes that the real market value of the subject property, identified as Account 2039, was $110,000 on the January 1, 2014, assessment date, as indicated by the pending sale price. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account 2039 was $110,000 for the 2014-15 tax year.

Dated this ___ day of November 2015.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR. Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on November 6, 2015.*